UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff** | ) |
| | )    **Docket No. 1:19-cr-00143-RGA** |
| v. | ) |
| | ) |
| **LORNE "BOB" ADAMS,** | ) |
| | ) |
| **Defendant.** | ) |

**<u>SENTENCING MEMORANDUM</u>**

Defendant Lorne ("Bob") Adams, by and through his counsel, Kevin F. Sweeney, respectfully submits this memorandum to assist the Court in fashioning an appropriate sentence. On August 17, 2020, Mr. Adams will appear before the Court to be sentenced for one count of filing a false tax return in violation of Title 26, Section 7206(1), United States Code. He will do so as a first-time offender who has voluntarily waived indictment, pled guilty, and paid in full the $112,628 of restitution required by his plea agreement. In addition, he proactively paid and voluntarily agreed to additional civil penalties and interest to the Internal Revenue Service ("IRS") totaling $131,921.60, which were not required by his plea agreement.[1] We respectfully submit that a measured balance of his uncharacteristic offense conduct against his complete remorse and full acceptance of responsibility, extremely low risk of recidivism, the need to avoid unwarranted sentencing disparities, and the need impose a sentence that is sufficient but not greater than necessary, supports a probationary sentence with a significant term of home confinement.

---

[1] Mr. Adams filed a motion to pay his restitution directly to the IRS plus additional penalties and interest prior to his sentencing date, which was granted by this Court. He is finalizing arrangements to do so and plans to make said payment later this week.

1

## I. GUIDELINES COMPUTATIONS

Mr. Adams agrees with the advisory sentencing guideline range calculated in the Presentence Investigation Report ("PSR"). He has no prior convictions. Based on a criminal history category of I and an adjusted offense level of 13, the sentencing guidelines advise a range of 12-18 months of imprisonment and a fine of $5,500-$55,000. PSR, ¶¶ 27-44, 93, 105. This places him in Zone C, which permits "a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention . . . provided that at least one-half of the minimum term is satisfied by imprisonment." PSR, ¶ 94.

## II. BACKGROUND AND CHARACTERISTICS

### A. Early Life

Mr. Adams comes from humble beginnings. PSR, ¶ 49. He grew up in a 100-year-old farm house in Seaford, Delaware. PSR, ¶ 49. Even though the rent was only about $100 per month, there were times when Mr. Adams's family couldn't afford to pay it and had to go without hot water or heat. PSR, ¶ 49-50. In the winter time, his family had to staple plastic to the windows of the house just to keep the snow out. PSR, ¶ 50. As a child, Mr. Adams's parents operated an over the road trucking company, which required his father to be gone for months at a time. PSR, ¶ 46. Although they did not have much to show for it, Mr. Adams's witnessed how very hard his mother and father worked to provide for his family and vowed to return the favor if he ever could. PSR, ¶ 49.

### B. Long Mountain to Climb

Mr. Adams has a high school education. PSR, ¶ 73. Unable to afford college, he set out on a journey to work his way up the career ladder one rung at a time. The first job he had was as a

photographer for a local newspaper. While working as a photographer, he supplemented his minimum wage salary with freelance work. Through the connections he made freelancing, Mr. Adams was given the opportunity to work for a computer software company. Armed with this experience, he was able to expand his skill set through a series of other jobs in the information technology and systems field. Over the course of over 30 years, Mr. Adams built himself up from a junior photographer to a successful and respected information technology and systems manager. PSR, ¶ 75-80. He was issued Forms W-2 for these jobs (collectively "salaried employment"), which he reported on his Forms 1040 each year.

In addition to his salaried employment, Mr. Adams started a small side business in the 2000s to supplement his income. PSR, ¶ 79-80. The business performed computer consulting and support services and sold computer services and equipment to both foreign and domestic clients. PSR, ¶ 13-15, 79-80.[2]

### C.     Devotion to Parents

During the recession of the late 2000s, Mr. Adams's parents' business began to struggle, which resulted in them filing for bankruptcy (*In Re Adams*, Case 08-10526-CSS (D. Del. 2008)). Ultimately, Mr. Adam's parents lost everything they owned including their trucking company. PSR, ¶ 51. Around this time, Mr. Adams took out a second mortgage on his then primary residence in the approximate amount of $180,000 to help his parents pay their living expenses. *See* Exhibit D.

One morning, while at his parents' house, Mr. Adams noticed it was very cold inside. Upon further inquiry, he came to learn that his parents could not afford their medication, electric bill, or food to put in their refrigerator. PSR, ¶ 52. It was at that point Mr. Adams realized that he

---

[2] One such client was a company in the Cayman Islands, which paid him regular compensation but did not issue him a Form W-2.

needed to grow his side business to further subsidize them. PSR, ¶ 52.

As Mr. Adams's side business grew, so did his life challenges. In 2013, his father was diagnosed with a rare and aggressive form of lung cancer. PSR, ¶ 53. After a little more than a month in the hospital, doctors determined that there was nothing they could do for him and released him home to hospice. PSR, ¶ 53. Recognizing that the end was near, Mr. Adams slept in the same room as his father for approximately three weeks. PSR, ¶ 53. During their remaining time together, he promised his father that he would always look out for his mother. PSR, ¶ 53.

One week after Mr. Adams's father died, his mother received an eviction notice. PSR, ¶ 55. After sitting down for a talk with her, he found out that she had been receiving phone calls demanding payment for his father's hospital stay, which she could not afford to pay. Again, Mr. Adams stepped up to the plate and took on not only her financial burden but became her primary caregiver as well. PSR, ¶ 55. He purchased a home for her in 2014 for approximately $140,000 and hired contractors to complete renovations necessary to make it handicap accessible. Around this time, he was working full-time for a company call Compressus that could no longer pay him (*See* Exhibit A, PSR, ¶ 77) and found himself in the middle of a costly dispute with a contractor over a house he was building for himself. Despite his best efforts, Mr. Adams's mother's health declined over the next six years, to the point where Mr. Adams had no choice but to move her into assisted living, where she passed away from Covid-19 in May of this year.

### D. Offense Conduct

Under the stress brought about by his parents' financial decline, his father's sudden illness and death, his mother's illness and caretaking demands, not getting paid from his employer, and the costly contractual dispute with his home contractor, Mr. Adams made a series of terrible decisions over a number of years that sent his life down an uncharacteristically bad path. Looking

to further supplement his income, Mr. Adams made the admittedly dumb, illegal, but conscious decision to begin causing his tax return preparer to file false tax returns on his behalf. Although he provided the return preparer with the income information for his salaried employment, he began concealing from her information concerning his side business. Mr. Adams knew that by hiding this information from his preparer, his tax returns would significantly understate his income, and in turn, help alleviate some of his financial frustrations.

When Mr. Adams was informed by a federal agent in August of 2018 that he was the subject of a criminal tax investigation, he panicked and went to the bank to withdraw his own legal source funds from his accounts in cashier's checks for amounts under $10,000. He withdrew this money to ensure that he and his family had accessible funds during his investigation and possible prosecution, and he chose these increments because he thought that transactions involving more than $10,000 would bring more scrutiny. Although there is no excuse for the manner in which Mr. Adams conducted these transactions, including the misleading statements made to bank employees in the process, it is important to note that he voluntarily put the money back, that the money underlying these transactions came from entirely legal sources, and that it made absolutely no difference to the government's tax investigation whether these funds stayed in the bank or went somewhere else.

### E. Devotion to Community

Mr. Adams's offense conduct is a stain on an otherwise decent life. In addition to being a devoted son, he is a loving husband who is "very supportive and offer[s] to help . . . in any way he [can]." *See* Exhibit D. Mr. Adams is also a caring stepfather who "attends baseball games, school events, doctors' appointments, and just about every aspect of [his stepchildren's] lives." *See* Exhibit D. He serves as a "mentor" to his stepchildren, with whom he has a very close

relationship. *See* Exhibit D. In fact, his wife's second oldest son relies on him specifically to help navigate through difficult issues, because he feels Mr. Adams is better suited to help him. *See* Exhibit D.

Mr. Adams is also a valued colleague who always "made it a habit to provide support to [other workers]." *See* Exhibit A. A former supervisor has described him as dedicated to the team, an example for others, and inspiring. *Id.* The same supervisor noted that, "even when [the company] couldn't pay him . . . he stayed on for the good of the company" contrary what most others would do in today's society. *Id.*

Mr. Adams is also a good friend and neighbor. He has been described as a "solid, unselfish, giving, and loving" person who offers "his help, guidance, [and] money" and opens "his home . . . during difficult times." *See* Exhibit B & C. Mr. Adams's friends and neighbors note instances of him "helping with [his elderly neighbor's] husband who had Multiple Sclerosis," always making himself available when "grass needed to be cut or some other task " was needed, and taking "great care of" and "opening his heart to" the loved ones of his friends. *See* Exhibits C & E. Additionally, Mr. Adams's character is illustrated by his community service to "Seaford's Annual Christmas Parades" and "The Seaford Boys and Girls Club," which he, his wife, and his stepchildren volunteered for as a family year-after-year. See Exhibit D & E. As much as he gave, one friend and neighbor noted that Mr. Adams "expected nothing in return." *See* Exhibit E.

**F.     Lifestyle**

Mr. Adams lives a modest lifestyle. He and his family drive a 6-year-old Volkswagen Jetta and a 2020 Toyota Camry, and usually take one modest vacation per year. PSR, ¶ 83. Although Mr. Adams has some savings, little will be left after he has paid the IRS, which will leave his family living mostly paycheck-to-paycheck in future years. PSR, ¶ 82.

G.  **Medical Conditions**

Mr. Adams has a host of medical issues, which are well documented in PSR ¶¶ 62-64. He currently is being treated by nineteen (19) physicians. PSR, ¶ 67. Most significantly, his infectious disease, neurologist, and rheumatologist are concerned that his immune system may be compromised, which could make him susceptible to catching diseases, including viruses like Covid-19. PSR, ¶ 69.

III.  **GROUNDS FOR DOWNWARD VARIANCE OR DEPARTURE**

Although the Sentencing Guidelines represent an "initial benchmark," they are "only one of the factors to consider" when imposing a sentence. *Gall v. United States*, 552 U.S. 38, 49, 59 (2007). Sentencing courts are required to "tailor the appropriate punishment to each offense in light of other concerns." *United States v. Booker*, 543 U.S. 220, 245 (2005). In so doing, they must consider any motions for departures from the recommended guideline range as well as the statutory sentencing factors and concerns, which can form the basis for a variance. *United States v. Fumo*, 655 F.3d 288, 317 (3d. Cir. 2011).

Title 18, Section 3553(a), United States Code sets forth the statutory factors and concerns a court must consider. They include the: (A) nature and circumstances of the offense; (B) history and characteristics of the defendant; (C) kinds of sentences available; (D) Sentencing Guidelines Range and pertinent policy statements of the Sentencing Commission; (E) need to avoid unwarranted sentence disparities; and (F) need to provide restitution to victims. *See* 18 U.S.C. § 3553(a)(1), (3)-(7). The sentence ultimately chosen must be "sufficient, but not greater than necessary" to: (A) reflect the seriousness of the offense; (B) promote respect for the law; (C) provide just punishment for the offense; (D) afford adequate deterrence to criminal conduct; (D) protect the public from further crimes of the defendant; and (E) provide the defendant with needed

educational or vocational training, medical care, or other correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a)(2).

A downward variance or departure to probation with a significant term of home confinement is warranted based on the following grounds:

### A. The Offense Conduct is Serious But Uncharacteristic.

There is no question that the filing of a false tax return is a serious offense. However, it is important to note that, unlike many defendants who come before this Court to be sentenced for tax crimes, Mr. Adams actually reported and paid taxes on his primary source of income each year – his Form W-2 salary - including the years of prosecution.

Moreover, despite not being temporally isolated, Mr. Adams's conduct is nonetheless uncharacteristic of the otherwise unblemished and decent life he has lived. Mr. Adams has no criminal history, a reputation for helping others, and has meaningfully contributed to the upbringing of his wife's children in their nurturing home. Although no excuse, the emotional and financial stress he was under during the time of his offense conduct appears to have played a role in the series of poor decisions he made.

Sentencing courts have discretion to lessen a defendant's sentence in cases where he or she is an otherwise law-abiding citizen who has lived a good life. *See United States v. Connors*, No. CRIM. 06-189, 2007 WL 2955612, at *5 (E.D. Pa. Oct. 9, 2007) ("As we expressed at sentencing, [the defendant's] criminal behavior, although long-standing, was aberrant. Other than his actions in this case, Defendant had led an admirable life, raising three children in an intact home, and supporting his mother-in-law and a disabled brother."); *United States v. Howe*, 543 F 3d 128 (3d Cir. 2008) (affirming probationary sentence and temporary home confinement for a wire fraud despite an 18-24 month guideline range where District Court termed the offense an

isolated mistake in the context of Defendant's otherwise upstanding life). The uncharacteristic nature of Mr. Adams's conduct supports a downward variance or downward departure under Section §5K2.20.

### B. Mr. Adams Has Complete Remorse and Has Demonstrated Extraordinary Acceptance of Responsibility,

The stand-up nature of Mr. Adams is evident by the way he responded to his failings. He has expressed deep regret and has fully accepted responsibility for his actions. Moreover, unlike many defendants who stand before this Court to be sentenced, Mr. Adams put his money where his remorseful mouth was, to attempt to make the IRS whole again.

The Third Circuit permits district courts to consider a defendant's "heartfelt remorse" in deciding an appropriate sentence. *Howe*, 543 F 3d at 138; *United States v.* Wright, 794 Fed.Appx. 231, 236 (3d Cir. 2020). During his interview with probation, Mr. Adams expressed that "he feels awful about what he has done and knows that he has not set a good example for his stepchildren." PSR, ¶ 24. Mr. Adams also talked about trying to do whatever he can to make it better to include "paying restitution in full to the IRS." PSR, ¶ 24. His friends and family corroborate his statements to probation. Speaking about how Mr. Adams owned up to his crimes, his best friend said, "He did not offer an excuse, only that doing so was a big mistake and that he was going to do everything he could to pay back what he owed." *See* Exhibit C. He further stated, "I wholeheartedly believe that Bob regrets his actions and understands just how wrong they were." *Id.* Mr. Adams's deep remorse for his actions in this case supports a downward variance or downward departure under Section §5K2.0.

District courts also have discretion to vary a defendant's sentence downward on the basis that he or she has demonstrated extraordinary acceptance of responsibility. *See United States v. Severino*, 454 F.3d 206 (3d Cir. 2006). Prior to charges being filed in this case, Mr. Adams

9

instructed his counsel to attempt to obtain a plea agreement so that he could immediately own up to his transgressions before this Honorable Court. These actions saved the government the time and expense of bringing an indictment, filing and defending against motions, and producing discovery. Despite this, he anticipates receiving the same three-point downward adjustment for acceptance of responsibility he would have likely received had he waited longer to plead guilty. Mr. Adams's early plea in this case is a factor that supports a downward variance.

In addition to seeking a plea agreement pre-indictment, Mr. Adams also instructed his counsel to find a way to make the IRS whole as soon as practicable. The solution suggested by the government was for Mr. Adams to consent to the execution of a Form 4549, Income Tax Examination Changes report, agreeing to the immediate assessment of taxes. However, the specific form presented to Mr. Adams by the government included penalties and interest totaling $131,921.60, which were not required under his plea agreement. Despite having no legal requirement to sign it, Mr. Adams did not hesitate to do so and immediately began making arrangements to pay his restitution as well as the additional penalties and interest in full prior to his sentencing date. Courts have found acceptance of responsibility to be extraordinary where the defendant went to great lengths to make the victim whole over and above that required in the criminal proceeding. *See United States v. Lieberman*, 971 F.2d 989, 996 (3d Cir.1992), abrogated on other grounds by *United States v. Douglas*, 885 F.3d 124 (3d Cir. 2018)(affirming a district court's pre-*Booker* downward departure on the basis of the defendant's extraordinary acceptance of responsibility as primarily demonstrated by his restitution). Mr. Adam's proactive efforts to not only make full restitution prior to sentencing but to pay amounts not required by his plea agreement support a downward variance or downward departure under §5K2.0.

### C. Mr. Adams Has an Extremely Low Risk of Recidivism.

The public need not be protected from Mr. Adams. After voluntarily arranging for his initial appearance, he was released on his own recognizance and has not violated any of the terms of his release. Moreover, statistics demonstrate that a defendant's criminal history is closely correlated with recidivism rates. *See* U.S. Sent'g Comm'n, Recidivism Among Federal Offenders (March 2016). As a first-time, non-violent offender with zero convictions, Mr. Adams has a virtually non-existent risk of recidivism. A defendant's low risk of recidivism can form the basis of a downward variance and should do so in this case. *See, e.g., Moore*, 344 Fed. Appx. at 768 (upholding district court's sentence of probation where district court granted downward variance based on facts including that the defendant "ha[d] been a ... law-abiding citizen throughout his life."); *Connors,* No. CRIM. 06-189, 2007 WL 2955612, at *5 (E.D. Pa. Oct. 9, 2007)(granting an approximately 46 percent variance below the Guidelines on several grounds, including the fact that the defendant presented no "significant possibility of recidivism").

It is important to note that the side business that generated the income that Mr. Adams concealed from the IRS no longer exists. Mr. Adams actually began slowly winding it down in 2015. By the time Mr. Adams learned that he was under investigation in August of 2018, his side business was all but closed. Given that Mr. Adams has always reported his primary source of income – his Form W-2 salary – to the IRS, there is no reason to believe he won't continue to do so in future years and, thus, no reason to believe his will repeat his poor decisions again.

### D. The Requested Sentence Will Avoid Unwarranted Sentencing Disparities.

In fashioning a sentence, courts must be mindful to avoid unwarranted sentencing disparities among defendants with similar criminal backgrounds convicted of similar criminal conduct. *Rita v. United States,* 127 S. Ct. 2456, 2463 (2007). According to the United States

Sentencing Commission data, of the 494 defendants sentenced for tax offenses nationwide in 2019 (the latest year for which this data is available), nearly 60 percent of them received downward variances. *See* Exhibit F. Moreover, the average sentence reduction for such variances was 61 percent. *Id.* To put it simply, in federal tax cases, most defendants receive a sentence to imprisonment that is less than half of what the low-end of the guidelines advised.

Based on a docket search for the District of Delaware, there have been at least four pre-indictment pleas in pure tax cases that include a Section 7206(1) count over the past decade. *See U.S. v. Eller*, 1:14-cr-00033-LPS; *U.S. v. Francis*, 1:11-cr-00004-GMS;[3] *U.S. vs. Worth*, Case 1:13-cr-00070-GMS;[4] *U.S. v. Lyons*, Case 1:18-cr-00066-RGA. In each of the referenced cases, the defendant received a sentence to imprisonment that was exactly 12 months less than the low-end of the advisory guideline range. In three of these cases, that range was 12-18 months, which is the same as it is here. In all three of those cases, the defendant was sentenced to probation. Such was the case even though it appears from the docket that none of these defendants paid restitution plus additional penalties and interests not required in their criminal proceedings prior to sentencing. By sentencing Mr. Adams to probation with a significant term of home confinement, this Court can avoid an unwarranted sentencing disparity.

E. **The Requested Sentence is Available and Sufficient But Not Greater Than Necessary.**

A sentence to probation with a significant term of home confinement is statutorily available and can be imposed with a modest downward variance or departure. Based on Mr. Adams's offense level, he is currently in Zone C, which allows for a split sentence. Since the

---

[3] Despite the Court not ordering restitution, the government's sentencing memorandum indicated that the Defendant had made no effort to pack back the taxes he owed.
[4] Despite the Court not ordering restitution, the judgement indicated that the Defendant was required to cooperate with the IRS concerning the taxes owed.

low-end of his advisory guideline range permits a sentence of 12 months of confinement, even if the Court granted no downward variance or departure, it could sentence him to six months of imprisonment followed by six months of home confinement. Consequently, a sentence of probation with a significant term of home confinement constitutes a mere six month deviation from that already permitted under Mr. Adams' advisory guideline range.

Public policy considerations behind the recently enacted FIRST STEP Act also favor home confinement over incarceration. Section 602 requires the Bureau of Prisons to place lower risk level prisoners on home confinement for the maximum amount of time permitted under the Act. FIRST STEP Act of 2018, Pub. L. No. 115-391, § 602, December 21, 2018, 132 Stat 5194. This FIRST STEP Act evidences a Congressional intent of encouraging home confinement for offenders that pose no danger or risk of recidivism. Although the FIRST STEP Act is not binding in this proceeding, a sentence that incorporates home confinement rather than incarceration for someone like Mr. Adams, who has such a low risk of recidivism, would be in keeping with Congressional intent.

Probation with a significant term of home confinement is a just punishment in this case. Such a sentence will "substantially restrict" Mr. Adams's freedom. *Gall*, 552 U.S. at 48. In addition to restricting his liberty, Mr. Adams will carry with him his felony conviction for the rest of his life. Moreover, he has already suffered the humiliation of his conviction being publicized to the world by the U.S. Attorney's Office in a press release, which has fulfilled the sentencing purposes of specific deterrence to him as well as general deterrence to others. Finally, by the time of sentencing, Mr. Adams will have paid more than twice the benefit he derived from his offense conduct to the IRS, which proves to him and to the world that crime certainly doesn't pay.

A sentence to incarceration is not necessary to achieve the purposes of sentencing given the price Mr. Adams has already paid and the lessons he has already learned. *See, e.g., United States v. Gupta,* 904 F.Supp.2d 349, 355 (S.D.N.Y.2012), *aff'd,* 747 F.3d 111 (2d Cir.2014) ("As to specific deterrence, it seems obvious that, having suffered such a blow to his reputation, Mr. Gupta is unlikely to repeat his transgressions, and no further punishment is needed to achieve this result."); *United States v. Vigil,* 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) (considering, when granting a variance, the "incalculable damage to his personal and professional reputation" from "tremendous media coverage") *aff'd,* 523 F.3d 1258 (10th Cir. 2008).

Moreover, given the uncertainty concerning his possible immune disorder, his family history for deadly reactions to Covid-19, and the fact that the Center for Disease Control ("CDC") acknowledges that social distancing measures are difficult to maintain in prison (See Exhibit G), a sentence to incarceration would put Mr. Adams at serious medical risk, which his wife and family are "worried sick" about. *See* Exhibit D. Given the availability and appropriateness of a sentence to probation with home confinement, imprisonment and the potential deadly risks that come with it are far greater than necessary. It is exactly these types of concerns that have moved U.S. Attorney General William Barr to direct BOP to increase the use of home confinement for prisoners at higher risk of contracting and having severe reactions to Covid-19 (*See* Exhibit H) and caused U.S. District Courts around the country to begin granting compassionate early releases. *See,* e.g., *United States v. Bertrand,* 2020 WL 2179387 (N.D. Fla. Apr. 29, 2020); *United States v. Harper*, 2020 WL 2046381 (W.D. Va. Apr. 28, 2020); *United States v. Ben-Yhwh*, 2020 WL 1874125 (D. Haw. Apr. 13, 2020).

### F. Other Considerations

If this Court determines that incarceration is necessary to fashion an appropriate sentence in this case, Mr. Adams respectfully requests that he be permitted to self-report and be given a delayed report date. As grounds for this request, Mr. Adams states that he does not pose a flight risk, does not pose a danger to the community, poses no threat of recidivism, and has a medical and family history that could make him more susceptible to catching and having a more severe reaction to Covid-19 than the average person.

Additionally, while determination of the place of custody rests with the BOP, Mr. Adams respectfully requests that if this Court orders incarceration, it also recommend to the BOP that he be placed at Butner, North Carolina. As grounds therefore, he states that the BOP facilities in Butner are appropriate to his anticipated classification, within a reasonable geographic distance from the family home, and include an expansive medical center capable of treating his various medical conditions.

## CONCLUSION

A measured balance of Mr. Adams's uncharacteristic offense conduct against his lifetime of good works, his complete remorse, his extraordinary acceptance of responsibility, his extremely low risk of recidivism, the need to avoid unwarranted sentencing disparities, and the need to impose a sentence that is sufficient but not greater than that required, supports a below guideline sentence in this case. Based on the totality of the facts and circumstances, he respectfully requests that this Court consider imposing a sentence to probation with a significant term of home confinement.

Respectfully Submitted,

*/s/ Kevin F. Sweeney*
KEVIN F. SWEENEY, ESQ.
Attorney for Defendant